

U.S. Department of Justice

*United States Attorney*
*Southern District of New York*

---

*Jacob K. Javits Federal Building*
*26 Federal Plaza, 37th Floor*
*New York, New York 10278*

June 11, 2024

**BY ECF AND EMAIL**
The Honorable Jennifer H. Rearden
United States District Court
Southern District of New York
500 Pearl Street
New York, New York 10007

  Re: *United States v. Jason Skeet*, 23 Cr. 632 (JHR)

Dear Judge Rearden:

  The defendant in this case, Jason Skeet, is scheduled to be sentenced on June 18, 2024, at 11:15 a.m., having pleaded guilty to Count One of Information 23 Cr. 632 (JHR) (the "Information"), which charged Skeet with conspiring to commit bribery, in violation of Title 18, United States Code, Section 371. The parties have stipulated to an applicable range under the United States Sentencing Guidelines ("U.S.S.G." or the "Guidelines") of 30 to 37 months' imprisonment (the "Stipulated Guidelines Range"). For the reasons below, the Government submits that a sentence within the Stipulated Guidelines Range is warranted.

**I. Background**

  **A. Background on New York City Department of Correction and Rikers Island**

  The jail facilities complex located on Rikers Island, in the Bronx, New York ("Rikers Island"), is operated by the New York City Department of Correction ("DOC"), a municipal agency that had a fiscal year 2021 budget that included $8,286,000 in federal funding. (PSR ¶¶ 8, 12.)[1] To operate its jail facilities, the DOC employs Correction Officers, among other jail personnel. The primary duty of Correction Officers is to ensure the care, custody, and control of the DOC inmate population. (PSR ¶ 11.) In connection with that duty, Correction Officers participate in inspections and searches of inmates and DOC facilities, and are tasked with, among other things, ensuring that contraband is not brought into the facilities at which they work. (*Id.*)

---

[1] Citations in the form of "PSR __" are to the Final Presentence Report docketed on February 22, 2024 (Dkt. 32).

According to the DOC Employee Rules and Regulations, employees of DOC facilities, including Correction Officers, "shall not enter into any transaction with an inmate, nor carry, convey, or make accessible to an inmate within a facility/command any intoxicant, opiate, narcotic, or other contraband article, nor traffic with an inmate in any manner." The DOC Inmate Handbook defines "contraband" to mean "any item that is not sold in the commissary, that is not on the approved list of permissible items, that is possessed in more than the approved amount[,] or that the inmate does not have permission to possess," including, "items that may disrupt the safety, security, good order and discipline of the facility." The DOC Inmate Handbook expressly prohibits inmates from possessing drugs and cellphones, stating that inmates "shall not sell or exchange prescription drugs or non-prescription drugs" and that they shall not possess any type of electronic telecommunication device or any part of such instrument. (PSR ¶ 10.)

DOC employees, including the defendant, receive training on employee rules and regulations, which, as described above, prohibit Correction Officers and other employees from, among other things, entering into transactions with inmates and providing inmates with contraband. (*Id.* ¶ 11.)

### B. The Defendant's Offense Conduct

Between at least January 2020 through June 2022, the defendant conspired with others to smuggle contraband, including marijuana, cigarettes, and food, to inmates housed at the Northern Infirmary Command ("NIC") on Rikers Island in exchange for bribes. (*See, e.g.*, PSR ¶¶ 19, 26.) Specifically, the defendant smuggled contraband for DOC inmates housed on Rikers Island at least approximately 100 times between the start of the COVID-19 pandemic and June 2022, in exchange for monetary payments totaling at least approximately $45,644, which were paid into a CashApp account used by the defendant. (*See id.* ¶¶ 26, 27.)

For example, on April 20 and May 9, 2022, a DOC inmate ("Inmate-1") using a contraband cellphone texted the defendant requesting cigarettes and marijuana. (PSR ¶ 15, 19.) On each occasion, the defendant agreed to smuggle in the contraband in exchange for $1,000, and Inmate-1 proceeded to transfer $1,000 via CashApp into an account identified by the defendant. (*See, e.g.*, PSR ¶¶ 15-17, 19-20.) With respect to the May 9, 2022 contraband request, the defendant, referencing two Ziploc bags containing marijuana, texted Inmate-1, in part, "two BIG zip coming your way." (*Id.* ¶ 20.) The contraband cellphone used by Inmate-1 was later recovered by law enforcement, and found to contain the below photographs, which, based on metadata, appear to have been taken only a few days after the defendant agreed to smuggle bags of marijuana for Inmate-1. (*See* PSR ¶ 21; Dkt. 1, 23 Mag. 1372 at 6.)

  

Similarly, on March 1, 2022, a different inmate ("Inmate-2") messaged the defendant using a contraband cellphone, requesting, among other things, four boxes of cigarettes, in advance of Inmate-1's transfer to a different Rikers Island jail facility. (PSR ¶ 23.) The defendant agreed to smuggle in the requested contraband for Inmate-1, for which he was paid $450. (*Id.*)

On June 30, 2022, during a voluntary interview with law enforcement officers, the defendant initially denied bringing in contraband on behalf of inmates, but later acknowledged that he smuggled contraband to inmates on Rikers Island approximately 100 times since the start of the pandemic, in return for CashApp payments made into an account controlled by a co-conspirator ("CC-1"). (PSR ¶ 26.) The defendant further estimated that he earned a total of $8,000 to $10,000 from the scheme, which he split with CC-1. (*Id.*) During the period of the offense, there were, in fact, approximately 136 payments into the CashApp account that the defendant identified for inmates in connection with the contraband smuggling scheme, totaling $45,644. (PSR ¶ 27.)

The defendant subsequently agreed to proffer with the United States Attorney's Office, and, in his initial proffer, made materially false statements concerning how he came to be involved in smuggling contraband, and who he was working with to smuggle contraband. (PSR ¶ 29.)

## II. Procedural Posture

On November 29, 2023, the defendant pleaded guilty to Count One of the Information, pursuant to a plea agreement. (PSR ¶ 4.). As set forth in the plea agreement, the applicable Guidelines offense level is 19, the defendant's Criminal History Category is I, and the Stipulated Guidelines Range is 30 to 37 months' imprisonment. The Stipulated Guidelines incorporate enhancements based on the value of the bribe payments, which exceeded $40,000, as well as the obstruction conduct detailed above.

In a sentencing memorandum filed on June 3, 2024, the defendant asks the Court to impose a time-served sentence (*i.e.*, a total of zero days imprisonment). (Def. Sub. (Dkt. 36) at 2.) The defendant principally argues such a sentence would be appropriate in light of the defendant's lack of a prior criminal record, the corrupt environment in which the defendant worked, and to avoid inconsistencies with sentences imposed on other correction officers who smuggled contraband into correctional facilities in other cases. (*Id.* at 4-7.)

Hon. Jennifer H. Rearden  Page 4
June 11, 2024

The United States Probation Department ("Probation") recommends a term of 12 months and one day of imprisonment. (PSR at 22.)

### III.  Discussion

#### A.  Legal Framework

The Guidelines, while no longer mandatory, still provide strong guidance to the Court following *United States v. Booker*, 543 U.S. 220 (2005). A "district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range," and that range "should be the starting point and the initial benchmark." *Gall v. United States*, 552 U.S. 38, 49 (2007). Although the Guidelines do not dictate a presumptively reasonable sentence, they are not merely a "body of casual advice." *United States v. Cavera*, 550 F.3d 180, 189 (2d Cir. 2008) (en banc) (internal quotation marks omitted). The Guidelines' relevance throughout the sentencing process stems in part from the fact that, while they are advisory, "the sentencing statutes envision both the sentencing judge and the Commission as carrying out the same basic § 3553(a) objectives," *Rita v. United States*, 551 U.S. 338, 348 (2007), and the Guidelines are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions," *Gall*, 552 U.S. at 46. To the extent the Court imposes a sentence outside the range recommended by the Guidelines, the Court must "'consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance.'" *Cavera*, 550 F.3d at 189 (quoting *Gall*, 552 U.S. at 46).

#### B.  A Sentence Within the Stipulated Guidelines Range is Warranted

The defendant repeatedly abused his position as a DOC Correction Officer, smuggling contraband including drugs to inmates on Rikers Island at least 100 times, in exchange for tens of thousands of dollars in bribes, over a multi-year period. He then obstructed justice by materially lying about his contraband smuggling activities to law enforcement officers. The nature and circumstances of the defendant's offense, the history and characteristics of the defendant, and the need for the sentence to achieve adequate deterrence, reflect the seriousness of the offense, and promote respect for the law, warrant a sentence within the Stipulated Guidelines Range. *See* 18 U.S.C. §§ 3553(a)(1), (a)(2).

*First*, a sentence within the Stipulated Guidelines Range is required to promote respect for the law and reflect the seriousness of the offense. Contraband smuggling in New York City jails is a serious crime. It adds an additional layer of dangerousness into an already precarious environment. The receipt and distribution of illegal drugs, in particular, presents the risk of violent conflict over jail drug turf. And the defendant's prolonged smuggling of contraband in exchange for monetary bribes significantly contributed to a culture of corruption and contraband smuggling at Rikers Island—the very culture to which he now attributes his offense conduct. The defendant's conduct, and the culture to which it contributed, made Rikers Island a more dangerous place, for inmates and officers alike.

The defendant's knowing breach of public trust, and his attempts to conceal his crimes, only increase the seriousness of his offense conduct. The defendant, who was trained on DOC

employee rules and regulations, clearly knew that what he was doing was wrong. Yet he continued to smuggle contraband over, and over, and over again. And he took steps to conceal his conduct, including by wrapping contraband in toilet paper and delivering the contraband to inmates in the middle of the night, and by using a CashApp account with a fake display name. (*See* PSR ¶¶ 17-18.) Even after being approached by law enforcement officers, the defendant continued his efforts to conceal the scope of his wrongful conduct. For example, during a voluntary interview with law enforcement officers in June 2022, the defendant minimized the amounts of the payments that he received as part of the scheme. Worse still, during a proffer session with the Government on June 16, 2023, the defendant lied about how he became involved in smuggling contraband and who he had been working with to smuggle contraband. It was not until the next proffer session, approximately three weeks later, that the defendant acknowledged his prior misstatements and was forthcoming. And while it was fortunate that the Government did not take further investigative action—such as conducting searches or arrests based on the false information the defendant provided—that was a real risk of his conduct.

In short, the sustained, repeated, and serious criminal conduct that the defendant engaged in throughout the course of his conspiracy belies the narrative the defendant advances in his sentencing submission, that is, that he simply "made a mistake" (Def. Sub. At 7) and was really the "victim" of his circumstances (*id.* at 4). Promoting the rule of law requires that individuals in the defendant's position of trust in a government institution – *i.e.*, those trusted with *enforcing* the rule of law – recognize that they will be held (at a minimum) to the same standard as those members of the public they serve. In short, any sentence imposed should promote public confidence that DOC Correction Officers, such as the defendant, who are entrusted with maintaining the order and discipline of jails do so with integrity and a keen awareness that they are not above the law.

*Second*, a significant sentence is also warranted to account for the defendant's history and characteristics. When the defendant began smuggling contraband into a Rikers Island jail facility in 2020, he was 43 years old, and had been a DOC employee since 2013. The defendant's contraband smuggling was not caused by a youthful lack of judgment, but rather reflected deliberate and sustained criminal conduct by an experienced and seasoned DOC employee. What's more, the defendant's contraband smuggling was an egregious violation of the trust that was vested in him to ensure the care, custody, and control of the inmates in his charge. And, while the defendant may be a first-time offender, that is already fully accounted for by the Guidelines. In addition to providing for shorter ranges for offenders in criminal history category I, the Guidelines now also include an offense-level reduction for the defendant's zero-point offender status. More than a history of otherwise law-abiding behavior and positive family relationships—especially from an experienced DOC Correction Officer—is required to support a variance from the Guidelines range of the sort sought by the defendant.[2]

*Third*, a sentence within the Stipulated Guidelines Range is necessary to achieve both specific and general deterrence. As to specific deterrence, while the defendant claims that the mere threat of prison is a sufficient deterrent for future criminal activity (Def. Sub. At 7),

---

[2] The fact that the Guidelines already meaningfully account for the defendant's lack of criminal history and corresponding lower risk of recidivism also casts doubt on Probation's reliance on those factors to justify recommending a substantial downward variance. (*See* PSR at 23.)

presumably the defendant, as a correctional officer, was well aware of the risk of being apprehended and subsequently imprisoned when he began to smuggle contraband. Yet he decided to do so anyway, in exchange for bribes, despite that risk. Moreover, the defendant subsequently engaged in obstructive conduct during interviews with law enforcement officers, despite the risk of additional consequences from such conduct. The time-served sentence the defense requests would send the defendant himself the exact wrong message: that he can commit serious crimes while still avoiding prison.

With respect to general deterrence, a significant sentence is needed to send a strong message to other correctional officers. As this case demonstrates, the opportunities for bribing DOC employees are manifold, and detecting bribery of DOC employees is difficult. This makes it all the more important when such criminal activity is detected—particularly at the scale and breadth of the defendant's wrongdoing—to send a strong deterrent message. A serious sentence is necessary to send the message that correctional officers lured by the same temptations as the defendant will suffer serious consequences if they succumb to those impulses and accept bribes from inmates or smuggle contraband into prisons. Meanwhile, a non-custodial sentence for receiving bribes to obtain and distribute contraband within the confines of a correctional facility would send precisely the opposite message: that getting caught committing this type of crime carries minimal consequences so long as when caught one eventually accepts responsibility and points blame at the institution itself. While the defendant should be credited for his pre-indictment acceptance of responsibility, that credit is already reflected in the three-offense level reduction incorporated into his Stipulated Guidelines Range. Moreover, a defendant's acceptance of responsibility does not by itself obviate the need for imprisonment, nor does it obviate the need to send a clear message to other corrections employees that prison time will result from accepting bribes and smuggling contraband into correctional facilities. To achieve general deterrence and respect for the law in a case of this nature, a serious sentence—one within the Stipulated Guidelines Range—is both appropriate and necessary.

*Finally*, the defendant's arguments concerning relative culpability are misplaced. (*See* Def. Sub. at 8.) All but one of the cases cited by the defendant involved lower bribe amounts than here and a correspondingly lower Guidelines range (18 to 24 months). (Def. Sub. at 5-6.) In the one case involving a slightly higher Guidelines range (37 to 46 months), it appears that the defendant had significant mitigating personal circumstances, which are not present here, prompting the Government to agree that a below-Guidelines sentence was appropriate in that case; additionally, the defendant in that case had not engaged in the obstructive conduct that the defendant engaged in here. (*See* Dkts. 27, 28, 21 Cr. 349 (JSR).)

More comparable to this case, in *United States v. Perry Joyner*, 21 Cr. 673 (ALC), the Court sentenced the defendant, a correctional officer at the Metropolitan Correctional Center, to 43 months' imprisonment for accepting tens of thousands of dollars in bribes to smuggle contraband to inmates. (*See* Dkt. 271 at 21, 21 Cr. 673 (ALC) (the Court noting, when imposing sentence, that "[t]here is a need here for general deterrence and punishment").) Although Joyner had a higher Guidelines range (51 to 63 months) than the range here (his sentencing pre-dated the zero-point offender reduction in U.S.S.G. § 4C1.1 and he had a managerial role), the nature and

scale of Joyner's conduct was otherwise markedly similar to the defendant's conduct here; Joyner was similarly in criminal history category I; and Joyner similarly engaged in obstructive conduct.[3]

In short, the need to avoid unwarranted sentencing disparities, considered in combination with the extremely serious nature and circumstances of the defendant's criminal conduct, the defendant's history and personal characteristics, the need to achieve specific and general deterrence, and the need to promote respect for the law, warrant a significant sentence within the Stipulated Guidelines Range of 30 to 37 months' imprisonment.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

---

[3] In addition, one of Joyner's co-defendants, Mario Feliciano, was sentenced to five months' imprisonment for *offering* to provide contraband to inmates on two occasions in exchange for about $3,200 in bribes. (*See* Dkts. 381, 391, 21 Cr. 673 (ALC).) The custodial sentence imposed on Feliciano, whose Guidelines range was 8 to 14 months' imprisonment, for conduct that was not nearly as egregious as the defendant's conduct here, further demonstrates that the defendant's requested time-served sentence would be inappropriate and create unwarranted sentencing disparities. *Cf. Gall*, 552 U.S. at 55 (noting that the need to avoid "unwarranted *similarities* among other co-conspirators who were not similarly situated" was a proper sentencing consideration).

Hon. Jennifer H. Rearden                                                                                                     Page 8
June 11, 2024

## IV.    Conclusion

For these reasons, the Government respectfully submits that a sentence within the Stipulated Guidelines Range of 30 to 37 months' imprisonment is warranted. In addition, the Government respectfully requests that during the sentencing proceeding, the Court orally order forfeiture in the amount of $45,644 as reflected in the previously docketed Consent Preliminary Order of Forfeiture. (Dkt. 27.) Finally, the Government requests that the Court impose a period of three years' supervised release to follow any term of imprisonment, with the special conditions set forth in the PSR.[4] (*See* PSR at 25.)

                                                         Respectfully submitted,

                                                         DAMIAN WILLIAMS
                                                         United States Attorney for
                                                         the Southern District of New York

By: _____
                Adam Z. Margulies
                Jonathan E. Rebold
                Derek Wikstrom
                Assistant United States Attorneys
                (212) 637-2345 / 2512 / 1085

cc: John Buza, Esq. (via ECF)

---

[4] In light of recent Second Circuit decisions, the Government respectfully requests that, for each special condition of supervised release that the Court intends to impose, the Court briefly state its reasons for concluding that each such special condition is "reasonably related" to at least one of the factors set forth in U.S.S.G. § 5D1.3(b). *See, e.g.*, *United States v. Sims*, 92 F.4th 115 (2d Cir. 2024) (vacating special condition and remanding for district court to provide sufficient explanation for imposition of condition); *United States v. Oliveras*, 96 F.4th 298 (2d Cir. 2024) (same); *United States v. Jimenez*, No. 22-1022, 2024 WL 1152535 (2d Cir. Mar. 18, 2024) (summary order) (same).